IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ALECIA T. CYPRIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:10-cv-226-MEF |
| | ) | |
| AUBURN UNIVERSITY | ) | (PUBLISH) |
| MONTGOMERY, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.  Introduction**

This cause is currently before the Court on the Defendants' motion for summary

judgment,  (Doc. #40), and the Defendants' motion to strike some of the evidence offered

by the Plaintiff in opposition to the motion for summary judgment, (Doc. #51).  The Plaintiff,

Dr. Alecia T. Cyprian (Cyprian), brings this suit against her former employer, Auburn

University at Montgomery (AUM), and her former supervisor, Dr. Katherine Jackson

(Jackson), under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.  Cyprian

claims that she suffered racial discrimination, was subjected to a racially hostile work

environment, and was ultimately dismissed from her job at AUM because she complained

about racial discrimination at work.  Because the Court finds that Cyprian has not established

a genuine issue of material fact in any of her claims, the Defendants' motion for summary

judgment is due to be GRANTED.  The Defendants' motion to strike is due to be DENIED

as moot.

## II.  Jurisdiction

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 (federal question).  The parties do not contest personal jurisdiction or venue and the Court finds adequate allegations of both.

## III.  Factual and Procedural Background[1]

Defendant AUM is a publicly-funded state university located in Montgomery, Alabama.  Chancellor John Veres directs AUM with the assistance of several vice chancellors.  Cyprian joined AUM on April 2, 2007 as the Dean of Student Affairs.[2]  Cyprian worked as the Dean of Student Affairs until AUM terminated her employment on June 3, 2009.  Cyprian is an African-American woman.

Defendant Jackson is AUM's Vice Chancellor for Outreach – a program that extends the resources of AUM to entities outside of the university.[3]  (Doc. #42 at 25).  On July 1, 2008, Jackson became Cyprian's immediate supervisor.  It was under Jackson's supervision that Cyprian claims she was subject to racial discrimination, a racially hostile work

---

[1]  For summary judgment purposes, the facts are construed in the light most favorable to the plaintiff.  *See Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046, 1050 (11th Cir. 2008).

[2]  The complaint states that AUM hired Cyprian on April 2, 2007.  (Doc. #38 at 2).  The response to the motion for summary judgment states that Cyprian joined AUM on April 12, 2007. (Doc. #46 at 10).

[3]  The evidence submitted by AUM indicates that Outreach is a division of AUM. Outreach has some revenue generating activities and the money earned from these activities is managed by AUM.  (Doc. #42 at 26).

environment, and unlawful retaliation.

As Cyprian's supervisor, Jackson met with her once a week or once every other week. Cyprian was required to meet with Jackson more frequently than was required of the white employees Jackson supervised.   (Doc. #38 at 3).  During these meetings, Cyprian reported on the ongoing activities of the Division of Student Affairs and other related matters. Cyprian felt that Jackson used these meetings to intimidate, pressure, criticize, and humiliate her.  (Doc. #38 at 3).   Cyprian also felt that Jackson required Cyprian to complete unreasonable tasks and participate in meetings and other assignments that were not required of white employees.   (Doc. #38 at 4). Cyprian first complained about a hostile work environment in the fall of 2008.[4]

As Dean of Student Affairs, Cyprian supervised AUM's police chief, Nell Robinson. One of Cyprian's supervisory responsibilities was to review the police department's annual performance evaluations completed by Robinson.  In January 2009, Robinson gave Cyprian the individual performance reviews for the police department employees, which the employees had signed.  During her review of the evaluations, Cyprian encountered several errors and returned the evaluations to Robinson for correction. To meet Jackson's deadline for submitting the reviews, Robinson corrected the evaluations and Cyprian and her staff

---

[4] Cyprian provides several different dates for her first complaint of a hostile work environment.  Cyprian's complaint states that she complained about a hostile work environment in November 2008.  (Doc. #38 at 3).  In her deposition, Cyprian indicated that she first complained about a racially hostile environment in "October or November of 2008."  (Doc. #42 at 5).  Cyprian's brief opposing summary judgment states that Cyprian complained about a hostile work environment in September 2008.  (Doc. #46 at 14).

retyped the evaluations to include the corrections.  The police employees did not see or sign their revised evaluations.  Cyprian delivered the corrected evaluations to Jackson who then reviewed the evaluations and determined that they had not been prepared properly.  (Doc. #42 at 6).  Jackson discovered that the evaluations contained internal inconsistencies and performance ratings that did not have the proper justifications. At least one evaluation incorrectly tallied the score for the employee's numerical rating.  (Doc. #42 at 7).  These errors caused Jackson to suspect that there had been a violation of AUM policy in preparing the evaluations.

In early February, Jackson and Jeanine Boddie-LaVan, a part-time human resources consultant at AUM, decided that AUM should conduct an investigation into the suspected violation of AUM policy.  The investigatory team consisted of three African-American women.[5]  The team concluded that Cyprian violated a provision of the AUM Personnel Policies and Procedures Manual, which forbids making unauthorized changes to documents. (Doc. #47-20 at 2).  In the AUM manual, this is a Group I violation – the most serious kind – and can be punished by immediate termination.  (Doc. #42 at 10).  Instead of termination, the investigatory team recommended that Cyprian receive a final written warning.  (*Id.* at 11). Cyprian later objected to parts of the investigatory report, and after further review, Cyprian received a formal written reprimand – a lesser form of discipline.  (*Id.* at 10).

---

[5] Jackson herself was involved in the investigation.  The parties agree that Jackson drafted questions that the investigatory team should use.  (Doc. #54 at 14).  There is also evidence that Jackson revised the team's final report.  (Doc. #47-14 at 5).

In February 2009, Jackson gave Cyprian a "below expectations" performance review for her work in 2008.  (*Id.* at 13).  Jackson stated that one reason for this review was that Cyprian did not produce evidence that she had indeed accomplished the annual goals set out in her January 2008 performance planning worksheet.  (*Id.*).  Jackson stated that another reason for this review was that Cyprian had difficulty working cooperatively with other people.  (Doc. #42, 14).  Jackson provided nine examples to support this statement.  On February 5, 2009, Cyprian met with Jackson and Veres to discuss Cyprian's annual evaluation.  Cyprian refused to sign the evaluation at the end of the meeting.  After the evaluation, Cyprian was placed on a performance improvement plan.

Cyprian took a Family and Medical Leave Act (FMLA) leave of absence from February 25, 2009 until March 16, 2009.  Cyprian cited the hostility of her working environment as the reason for taking this leave.  (Doc. #38 at 4; Doc. #46 at 14).

On March 5, 2009, Cyprian sent Jackson two different letters.  In the first letter, Cyprian responded to her "below expectations" rating on her annual evaluation.  (Doc. #47-54).  Cyprian's letter addresses what she believed to be inaccuracies in her annual performance review.  The letter disputes many of the assertions in the review and provides details regarding several disagreements involving Cyprian, Jackson, and other staff at AUM.  A portion of the letter states that Cyprian "[does not] want to create a hostile work environment for anyone, and will not have one created for [her]."  (Doc. #47-54 at 7).

In her second letter, Cyprian complained to Jackson about racial hostilities in the

workplace.  (Doc. #47-17).  This letter begins by stating: "Please allow this letter to serve as notification that based on my race, African American, I perceive that you create a racially intimidating hostile work environment for me." (Doc. #47-17).  Cyprian's letter describes several situations in which Cyprian perceived that Jackson believed "what was told to [her] by White employees and have on every occasion dismissed my comments."  (Doc. #47-17).

AUM retained Christine Sims, an outside human resources consultant, to investigate Cyprian's allegations of race discrimination.  (Doc. #42 at 16).  In her April 3, 2009 report on the investigation, Sims indicated that she had reviewed Cyprian's claims that she was being evaluated differently than white employees and that Jackson had inappropriately influenced the campus police investigation. (Doc. #41-2 at 49).  Sims found that there was no evidence that Jackson had directed or influenced the investigation into the altered campus police evaluations.  Sims concluded her report by stating that "[b]ased on the information reviewed during the investigation, the allegation that Dr. Katherine Jackson has created a racially hostile work environment for Dr. Alecia Cyprian was not substantiated." (*Id.* at 51). On April 29, 2009, Veres delivered Sims's conclusion to Cyprian, indicated that he considered the matter closed, and urged Cyprian to address the deficiencies in her "below expectations" review.  (Doc. #41-2 at 159).

Unrelated to Cyprian's claims of racial discrimination, in March 2009 Veres hired Dr. Ron Sims, an organizational behavior professor at the College of William & Mary, to conduct an organizational analysis of AUM.  Dr. Sims is African American.  Dr. Sims

delivered a report of his organizational analysis on March 11, 2009.  The report made 15 recommendations for improving the operations of Cyprian's Division of Student Affairs – more than twice the amount of recommendations he made for improving any other AUM division.  (*Id.* at 20).  In the course of his organizational analysis, Dr. Sims communicated with Cyprian and learned about Cyprian's claims of a hostile work environment.  Dr. Sims's report concluded that Cyprian was sometimes difficult to interact with and that a plan should be implemented to develop her leadership skills.  Based on this recommendation, Veres assigned Timothy Spraggins, AUM's Assistant Vice Chancellor for Diversity, to be Cyprian's mentor.  Spraggins is African American.

On June 2, 2009, Dr. Sims returned to AUM to participate in a leadership retreat for senior AUM administrators and to review his recommendations from his March 2009 organizational analysis.  (Doc. #42 at 21).  During the retreat, Dr. Sims observed Cyprian engaging in behavior he described as negative, offensive, arrogant, uncooperative, defensive, and sharp.  (*Id.* at 22).

On June 3, 2009, Cyprian met with Dr. Sims and Dr. Keivan Deravi.  At the time, Deravi was AUM's incoming Interim Vice Chancellor of Academic Affairs who would soon be Cyprian's supervisor.  In the meeting, Cyprian reiterated her complaints of a hostile work environment, racial discrimination, and harassment at work.  (Doc. #46 at 19).  Dr. Sims described Cyprian's behavior during that meeting as unreceptive and hostile.  (Doc. #42 at 23).  After the meeting, Dr. Deravi stated that he no longer wanted to supervise Cyprian.

7

(*Id.*).  Based on his own observations, Dr. Sims made an oral recommendation that Veres terminate Cyprian's employment immediately.  On June 3, 2009, Veres told Cyprian that she would be dismissed from AUM.  In a letter to Cyprian written that same day, Veres stated: "It has been determined that a change in leadership in Student Affairs is necessary.  Today will be your last working day at Auburn Montgomery.  You will be placed on administrative leave immediately. You will be paid through 3 July 2009." (Doc. #47-28).  On June 6, 2009, Dr. Sims made a written recommendation to Veres confirming his previous oral recommendation.  He wrote:

> I strongly recommend that you immediately terminate [Cyprian] and begin the process of finding a permanent replacement. [Cyprian] is the single largest disruptive factor on campus.  Given the critical leadership role that the Dean must play in Auburn University at Montgomery's efforts to improve the services offered to its current and future students, to build a Division where staff work together as a team, and the Division positively collaborates with other important stakeholders across campus (i.e. faculty, staff, and other administrators) the institution can no longer afford to have one individual (the current Dean) stand in the way of achieving such goals.

(Doc. #42, 23).[6]

     After Cyprian's dismissal, Kathy Mitchell and Dr. Yulanda Tyre assumed Cyprian's responsibilities.  Mitchell was named the Interim Dean of Student Affairs and Tyre was named the Interim Associate Dean of Student Affairs.  Mitchell is white and Tyre is African American.  Tyre later became the Interim Dean of Student Affairs and Boddie-LaVan

---

[6]  In their motion for summary judgment, the Defendants say that Dr. Sims delivered his recommendation on June 6, 2009.  In his affidavit, Dr. Sims states that he submitted his written recommendation on June 5, 2009.  (Doc. #41-14 at 2).

became the Interim Associate Dean.  Boddie-LaVan is African American.

On June 30, 2009, Cyprian filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) alleging discrimination based on race and retaliation.  On December 30, 2009, the EEOC stated that it was unable to conclude that the information obtained during its investigation into Cyprian's allegations established an employment law violation. The EEOC also informed Cyprian of her right to sue.  Cyprian filed a complaint in this Court on March 12, 2010.  She filed a second amended complaint on November 4, 2010.  The second amended complaint contains three causes of action. Count I alleges a hostile work environment.  Count II alleges unlawful racial discrimination. Count III alleges unlawful retaliation.

On November 9, 2010, AUM answered Cyprian's second amended complaint and moved for summary judgment.  Cyprian filed a brief opposing summary judgment and AUM moved to strike several of the exhibits and other evidence offered by Cyprian in support of her brief.  Both the motion to strike and the motion for summary judgment have been fully briefed and are ripe for disposition.

## IV. Discussion

A.    **The Defendants' motion to strike**

The Defendants moved to strike several affidavits and exhibits offered by Cyprian to support her brief opposing summary judgment.  (Doc. #51).  Federal Rule of Civil Procedure 56© makes it plain that affidavits or declarations submitted to oppose a motion "must be

made on personal knowledge, set out the facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Affidavits which set forth conclusory arguments rather than statements of fact based on personal knowledge are improper. *See, e.g., Thomas v. Ala. Council on Human Relations, Inc.*, 248 F. Supp. 2d 1105, 1112 (M.D. Ala. 2003). Sworn statements which fail to meet the standards of Rule 56© may be subject to a motion to strike. *Id.* However, the Court need not strike the entire affidavit. Rather it may strike or disregard the improper portions and consider the remainder of the testimony or statement. *See Givhan v. Electronic Eng'rs, Inc.*, 4 F. Supp. 2d 1331 at 1334 n.2 (M.D. Ala. 1998). In deciding the Defendants' motion for summary judgment, this Court will exercise its discretion to disregard any improper portions of the challenged affidavit or declarations. Accordingly, the Defendants' motion to strike is due to be denied as moot.

**B.    Summary judgment standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. of Civ. P. 56(a). A party may demonstrate the existence of or absence of a genuine dispute as to any material fact by pointing to materials in the record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations. . . admissions, interrogatory answers, or other materials." *Id.* The movant "always bears the initial responsibility of informing the district court of the basis for its motion," and

10

identifying those evidentiary submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings" and by its own evidentiary submissions or those on file, demonstrate that there is a genuine factual dispute for trial. *Id.* at 324.  The Court must draw all justifiable inferences from the evidence in the non-moving party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Evidence presented by the non-movant must be believed and all justifiable inferences must be drawn in favor of the non-movant. *See Anderson*, 477 U.S. at 255.  Nevertheless, unsupported speculation does not create a genuine issue of material fact. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).  Similarly, mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory assertions . . . , in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment.").  Statements in affidavits that are based, in part, upon information and belief, cannot raise genuine issues of fact, and thus also cannot defeat a motion for summary judgment. *Pace v. Capobianco*, 283 F.3d 1275, 1278–79 (11th Cir. 2002).

**C.  Claims against Dr. Jackson**

As an initial matter, the claims against Jackson are due to be dismissed.  With respect to the Title VII claims, Jackson is not Cyprian's employer.  Indeed, Jackson is not an employer at all as that term is used in Title VII of the Civil Rights Act.[7]  Moreover, "[i]t is well established in the Eleventh Circuit that Title VII does not provide a cause of action against individuals."  *See Busby v. City of Orlando*, 931 F.2d 764 (11th Cir. 1991).

As for the § 1981 claims, Cyprian argues that Jackson was employed by Outreach, that Outreach is an entity separate from AUM, and that Outreach operates in the private sector. (Doc. #38 at 3).  In contrast, AUM argues that Outreach is a part of AUM and that Jackson is employed by AUM as vice chancellor of Outreach.  (Doc. #42 at 25).  AUM provided organizational charts and the testimony of several senior AUM administrators to support this point. (Doc. #42 at 27).  It is not entirely clear from the briefs why the parties are concerned about Outreach's relationship with AUM.  The Court surmises that the parties are concerned about the relationship because it may affect Cyprian's ability to sue.  For example, if Outreach is a part of AUM, then there can be no cause of action against Jackson under § 1981 because Jackson, as an employee of a state university, would be a state actor.  A § 1981 claim against Jackson would be subject to dismissal because § 1983 provides the exclusive remedy against state actors for violations of the rights contained in § 1981.  *See Butts v.*

---

[7] *See* 42 U.S.C. § 2000e(b) ("The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . . .").

*County of Volusia*, 222 F.3d 891, 893 (11th Cir. 2000).  If, however, Outreach is a private

entity separate from AUM, then there may be a claim against Jackson under § 1981 because

§ 1981 creates a cause of action against private actors.  *See Johnson v. Ry. Express Agency,*

*Inc.*, 421 U.S. 454, 459-60 (1975); *Harris v. McDonald's Corp.*, 901 F. Supp. 1552, 1558

(M.D. Fla. 1995) ("Unlike [§ 1983], both private actors as well as State actors are liable

under § 1981.") (citing *General Bldg. Contractors v. Pennsylvania*, 458 U.S. 375 (1982)).

In her response to the motion for summary judgment, Cyprian describes some of Outreach's

activities but Cyprian has not demonstrated that there is a genuine factual dispute for trial on

this issue.  Without such evidence the Defendants' motion for summary judgment with regard

to the claims against Jackson is due to be granted.[8]

## D.  Claims against AUM

### 1.  Count I - Hostile work environment

Count I of Cyprian's complaint alleges that AUM violated Title VII of the Civil

Rights Act and 42 U.S.C. § 1981 by creating a racially hostile work environment.  (Doc. #38

at 18).  Title VII and § 1981 hostile work environment claims have the same elements and

are subject to the same analytical framework.  *See Shields v. Fort James Corp.*, 305 F.3d

1280, 1282 n.2 (11th Cir. 2002).  Title VII makes it unlawful "to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment,

---

[8]  Where, as here, the defendants are state actors, a plaintiff's § 1981 claims usually
merge into her § 1983 claims and courts treat them as a single claim.  *See Taylor v. Alabama*, 95
F. Supp. 2d 1297, 1309 (M.D. Ala. 2000) (DeMent, J.).   In this case, however, there are no §
1983 claims into which the § 1981 claims can be merged.

because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1).  This section prohibits an employer from maintaining a hostile work environment.  "A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  To prevail on a hostile work environment claim, a plaintiff must show:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [race]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under a theory of vicarious or of direct liability.

*Miller*, 277 F.3d at 1275.  Importantly, Title VII claims for hostile work environment are based on the cumulative effect of individual acts and not on the actionability of individual acts themselves.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

AUM argues that, even assuming the first three elements of this claim are met, Cyprian has not shown that the racially discriminatory conduct was severe or pervasive and thus cannot satisfy the fourth element of her racially hostile work environment claim.  (Doc. #42 at 43)

To establish the "severe or pervasive" element, a plaintiff must show not only that she subjectively perceived the working environment to be abusive but also that a reasonable

person would view the environment as hostile and abusive.  *See Reeves v. DSI Sec. Svcs., Inc.*, 395 F. App'x 544, 546 (11th Cir. 2010) (citing *Miller*, 277 F.3d at 1276).  In this analysis, this Court will not consider statements or conduct that are unrelated to race.  *Id.* at 546 (quoting *Baldwin v. Blue Cross/Blue Shield of Ala.* 480 F.3d 1287, 1301-02 (11th Cir. 2007)).

Cyprian alleges the following incidents of harassment: (1) on four occasions AUM employees made race-based comments; (2) Cyprian was subject to more frequent meetings than white colleagues and was not assigned to a new supervisor after complaining about hostilities; (3) Cyprian was subject to discipline for altering AUM records but other white employees were not disciplined for similar conduct; (4) AUM discriminatorily applied its tenure policy when it denied tenure to a professor from Bangladesh; (5) African-American employees were held to different standards of conduct; (6) Jackson improperly influenced the investigation into Cyprian's discrimination complaints; (7) and Jackson improperly influenced the campus police evaluation investigation.  (Doc. #46 at 26-35).  There is no question that Cyprian believes that these instances demonstrate that racial harassment was severe or pervasive.  The question for the Court to answer is whether there is a genuine issue of material fact regarding whether the alleged racial harassment was objectively severe or pervasive.

In evaluating whether the harassment was objectively severe, this Court must look at the totality of the circumstances and consider, among other things, "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or

humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276.

First, the evidence Cyprian has provided shows that the alleged conduct was not "physically threatening or humiliating." Second, Cyprian alleges that the she was constantly subjected to racial discrimination. But even assuming that each of the alleged instances of discrimination was racially motivated, the alleged instances – occurring over a period of approximately eighteen months – are not sufficiently frequent for this Court to objectively find that racial harassment permeated the workplace. *Compare Miller*, 277 F.3d at 1276 (ethnic slurs directed at the plaintiff three to four times daily is severe and pervasive) *with Alexander v. Opelika City Sch.*, 352 F. App'x 390, 393 (11th Cir. 2009) (affirming summary judgment for the defendant where the plaintiff alleged that he had been constantly subjected to a racially derogatory term, but could only remember being subject to the term on eight specific occasions over the course of two years).

Third, assuming that Cyprian's allegations of racial harassment are true, when viewed cumulatively, the racial harassment is insufficiently severe to support a hostile work environment claim. Cyprian claims that an African-American employee was referred to as "Do Boy", that a vice chancellor stated that no African-American employee should make $95,000, that a supervisor told Cyprian she was hiring too many African-American employees, and that an African-American assistant received a note saying "we do not like blacks here." These comments, only some of which were directed at Cyprian, do not meet the standard of severity in this circuit. *See McCann v. Tillman*, 526 F.3d 1370 (11th Cir.

16

2008) (affirming summary judgment for the defendant on a hostile work environment claim where the African-American plaintiff was referred to by her supervisor as "girl" and where the defendant sheriff allegedly referred to a former African-American employee as a "nigger bitch" and declared that "he had never received the 'nigger vote' and that he didn't want it."); *Barrow v. Georgia Pacific Corp.*, 144 F. App'x 54, 57 (11th Cir. 2005) (affirming summary judgment for the defendant when the plaintiff's supervisors called him a "nigger," "boy" and told him "that if he looked at 'that white girl' he would 'cut' him."); *LaBeach v. Wal-Mart Stores, Inc.*, No. 5:07-CV-12 (HL), 2009 WL 902030, at * 4 (M.D. Ga. Mar. 27, 2009) (granting summary judgment for the defendant on racial harassment claim where supervisor, among other things, made three racist statements to the plaintiff, including telling the plaintiff to fire all African-American employees "because they are niggers, lazy, and too stupid to do their job."). The other conduct Cyprian alleges is even less severe. Even assuming a racial motivation, requiring Cyprian to participate in more frequent meetings, failing to assign her to a new supervisor, denying tenure to a Bangladeshi professor, expecting different behavior from different employees, influencing the investigation of racism at AUM, and influencing the investigation of Cyprian's misconduct are not examples of Cyprian being subject to severe or pervasive harassment. *Cf. Coney v. Dept. of Human Res. of State of Ga.*, 787 F. Supp. 1434 (M.D. Ga. 1992) (finding a hostile work environment where the plaintiff alleged wrenches were thrown at him, his tires were punctured, a picture of an African-American male being lynched was left on his desk, and he was subject to threats, racial slurs, jokes, insubordination, and profanity).

17

Cyprian alleges that the racial discrimination was so severe that she had to seek medical attention and take an FMLA leave of absence. (Doc. #46 at 35). A review of Cyprian's medical record indicates that her chief complaint was shoulder pain and the only symptom was an aching shoulder. (Doc. #47-15). AUM suggested that there were alternative reasons for Cyprian's shoulder pain and requested that Cyprian supplement the medical record she provided. (Doc. #54 at 18, n.6). Cyprian stated that she would supplement the discovery to include her full medical record, but she has not done so. (Doc. #57 at 32). As a result, other than her own statement that she had been under stress at work, there is no indication in the medical report that the pain in her shoulder is work-related and there is no physician recommendation that Cyprian take time off from work for therapeutic reasons. Without an objective connection between the stress at work and her need for medical attention, Cyprian's visit to the doctor and her FMLA leave provide little, if any, support for Cyprian's claim that she was subjected to objectively severe or pervasive racial harassment at work.

Cyprian argues that her perception of a hostile work environment "was reasonable and in fact shared by numerous other employees, as established through exit interviews, affidavit testimony and sworn statements to the Equal Employment Opportunity Commission, all of which remain under investigation by the Commission." (Doc. #46 at 35). The Court has reviewed this evidence. The two exit interviews to which Cyprian refers make no reference to a racially hostile work environment and therefore do not support Cyprian's argument that racial discrimination at AUM was objectively severe or pervasive. (Doc. #47-45; Doc. #47-

18

46).  Similarly, Mary "Bunny" Crabtree's EEOC charge does not allege racial discrimination and therefore does not support Cyprian's argument.  (Doc. #47-42 at 6).  The portion of Debra Foster's affidavit that Cyprian relies on states "[u]nder the direction of Dr. Katherine Jackson, Dr. Alecia Cyprian and I both were subjected to a hostile work environment."  (Doc. #47-14).  This statement does not support Cyprian's argument that the environment at AUM was racially hostile.  Later in the affidavit, Foster concludes that "racial discrimination permeated the workplace."  (Doc. #47-14, 4).  This statement is based on Foster's "background and education in Human Resources" and not on facts known personally to her. Therefore, it is inadmissible evidence.  *See* Fed. R. Civ. P. 56(c)(4).  Additional statements in Foster's affidavit address issues that this Court has already determined do not constitute severe or pervasive harassment.[9]  The only remaining documents that Cyprian alleges support her claim that racial harassment was objectively severe or pervasive are Dr. Seranjul Bhuiyan's EEOC charge, Louvenia McCray's EEOC charge, and Adrienne Giles's affidavit. Bhuiyan's EEOC charge alleges that he was passed over for tenure based on his race.  (Doc. #47-43).  McCray's EEOC charge alleges that she was subject to race discrimination during her employment at AUM and when she was dismissed from AUM.  (Doc. #47-44).  Giles's affidavit states that she was discriminatorily required to use a time clock, that she received

---

[9]  For example, Foster says that Jackson would listen to white employees and refused to acknowledge the contributions of African Americans.  Foster also says that AUM did not promptly respond to Cyprian's complaints in the fall of 2008, that Foster was required to meet more frequently with Jackson than white employees, that she was subject to false accusations of bad behavior, that Jackson unduly influenced the investigation into Cyprian's race-based complaints, and that AUM disparately applied its disciplinary policy.

an anonymous note stating "we do not like blacks here", and that she has been subject to racial discrimination at AUM for years.   (Doc. #47-34).   In the Court's view, the EEOC charges of these two employees, one anonymous note, and a dislike for a time clock do not meet the standard of objective severity or pervasiveness used by this circuit to evaluate hostile work environment claims.  *See, e.g., McCann*, 526 F.3d at 1379.

In sum, there is no genuine issue of material fact regarding whether AUM created a work environment for Cyprian that was permeated with discriminatory intimidation, ridicule, and insult.  *See Miller*, 277 F.3d at 1275.  Therefore, the Court finds that Cyprian has not established that she was subject to racial harassment at AUM that was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.

### 2.  Count II - Disparate treatment

Count II of Cyprian's complaint alleges that AUM violated Title VII of the Civil Rights Act and 42 U.S.C. § 1981(a) by discriminating against her based on her race.  (Doc. #38 at 20).  Cyprian asserts two different bases for her race discrimination claim.  First, she claims that she was discriminated against because AUM treated her differently than other employees outside of her protected class.  Second, she claims that she was discriminated against when she was dismissed from AUM.

Federal courts use the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to evaluate Title VII race discrimination claims that are based on

circumstantial evidence.[10]   *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).   Under this framework, the plaintiff must first establish a prima facie case of discrimination. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1527–28 (11th Cir.1997). If the plaintiff can make out a prima facie case, the burden shifts to the defendant to articulate legitimate, nondiscriminatory reasons for its actions.   *Id.*   Once the defendant articulates legitimate, nondiscriminatory reasons for its actions, the presumption of discrimination is eliminated and the burden shifts back to the plaintiff to show that the defendant's proffered reasons are pretextual.   *Id.*

### a.      Prima facie case of race discrimination

To make out a prima facie case of racial discrimination based on circumstantial evidence a plaintiff must show (1) that she belongs to a protected class; (2) that she was qualified to do the job; (3) that she was subject to an adverse employment action; and (4) that she was replaced by a person outside her protected class or she was treated less favorably

---

[10]   In her brief opposing summary judgment, Cyprian claims that she has direct evidence of racial discrimination and therefore the *McDonnell-Douglas* burden-shifting framework does not apply.  (Doc. #46 at 49).  Cyprian does not point to any evidence in particular to support this assertion and so the Court finds that Cyprian has not adequately demonstrated direct evidence of discrimination.  *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999) ("'[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race]' will constitute direct evidence of discrimination." (quoting *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir.1990)).  Thus, the Court will analyze Cyprian's circumstantial evidence under the *McDonnell-Douglas* burden-shifting analysis.

than a similarly-situated individual outside her protected class.[11]  *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

AUM does not dispute the first three elements of the prima facie case.  Instead, AUM argues that Cyprian cannot establish the fourth prong of the prima facie case, which requires the plaintiff to show either (1) that she was replaced by an employee outside of her protected class; or (2) that she was treated less favorably than those outside of her protected class.

## I.   Replacement by an employee outside Cyprian's protected class

After AUM dismissed Cyprian, it assigned her duties to an Interim Dean of Student Affairs and an Interim Associate Dean of Student Affairs.  Kathy Mitchell, a white woman, became Interim Dean of Student Affairs and Yulanda Tyre, an African-American woman, became the Interim Associate Dean of Student Affairs.  Tyre was later named Interim Dean of Student Affairs and Jeanine Boddie-LaVan, another African-American woman, became Interim Associate Dean of Student Affairs.

Thus, there is evidence that immediately following Cyprian's dismissal an employee outside of Cyprian's protected class assumed some of Cyprian's duties.  AUM claims that Kathy Mitchell was only a temporary replacement for Cyprian and that Yulanda Tyre was the actual replacement.  AUM argues that Cryprian cannot establish a prima facie case based

---

[11]  The analysis for a Title VII claim of disparate treatment is the same as the analysis for a § 1981 claim.  *See Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) ("Where, as here, a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under section[ ] 1981 . . . , the legal elements of the claims are identical.").

upon the race of a temporary replacement when the ultimate replacement is a member of the plaintiff's protected class.  AUM has not provided any authority for this position, but Cyprian has provided authority for the opposite position.  *Cf. Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 318 (6th Cir. 2007) (holding that the fourth element of the prima facie case in an age discrimination case – that the plaintiff was replaced by a younger worker – is satisfied "even where the new hire, who is a member of the non-protected class, has the title of 'temporary' employee"; "merely designating the new hire 'temporary' will not defeat the fourth element"); *Williams v. Ala. Dept. of Transp.*, 509 F. Supp. 2d 1046, 1054-55 (M.D. Ala. 2007) (DeMent, J.) (finding a factual dispute as to the fourth prong where the defendants classified the replacement employee as temporary); *Tolbert v. Briggs & Stratton Corp.*, Civil Action No. 3:05cv1149-MHT, 2007 WL 445454, *4 (M.D. Ala. Feb. 8, 2007) (Thompson, J.) ("If an employer could insulate itself from a Title VII suit merely by reassigning a discharged employee's duties to a white employee but never formally call it a replacement, Congress's intent in enacting Title VII would be thwarted.").

The situation in this case is more nuanced than just one temporary replacement employee from outside the plaintiff's protected class.  This is because Cyprian's responsibilities were initially split between one white temporary employee and one African-American temporary employee.  Still, the Court finds that for purposes of the prima facie case Cyprian has demonstrated that she was replaced, at least in part, by a person outside of her protected class.

> ii.     Less favorable treatment than someone outside of Cyprian's
>         protected class

Cyprian also argues that similarly situated comparators from outside of her protected class received more favorable treatment.  Specifically, she claims that other employees at AUM engaged in behavior similar to Cyprian's, but that these other employees were not disciplined or discharged.  Cyprian points to the following comparators as evidence of racial discrimination through disparate treatment:

a.     Jackson altered university records but was not reprimanded.

b.     Veres failed to follow a portion of the Faculty Handbook but was not dismissed for doing so.

c.     Steven Crotz, the University's Athletic Director and a white male, is negative, too expressive, and sarcastic but was not dismissed.

d.     Elizabeth Ward, AUM's registrar and a white woman, is unprofessional, negative, and disruptive but was not punished.

e.     Dr. Jennifer Brown, Dean of Education and a white woman, described herself in a self-evaluation as negative, overtly expressive, and not positive toward colleagues, but was not dismissed.

f.     Kathy Mitchell, a white woman who assumed some of Cyprian's duties, is difficult to work with and lacks communication skills, but was not dismissed.

g.     Tami Wallace, a white woman, lacks communication skills and is hostile, negative, and fails to meet deadlines, but was not dismissed.

h.     Wanda Blake, a senior administrator and white woman, made racially derogatory comments and was the subject of numerous complaints about her interpersonal skills but was not dismissed.

I.     Susan Salter, Director of University Relations, was not reprimanded for failure to complete several tasks by the appointed deadlines.

j.   Janet Warren, the former Vice Chancellor for Academic Affairs and a white woman, did not follow the Faculty Handbook in 2008 but was not investigated or reprimanded for failing to do so.

k.   Melinda Kramer, the Associate Registrar and a white woman, was not disciplined despite numerous claims that she is racist.

(Doc. #46 at 43-49).

"To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that [she] and the employees are similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). To determine whether employees are similarly situated, this Court evaluates "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). Additionally, the "quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Id.* at 1368 (citation omitted).

Based on this criteria, Kramer and Brown cannot be considered valid comparators because their conduct is not sufficiently similar in quality to Cyprian's. Kramer is alleged to have engaged in racism, but there was not a similar allegation against Cyprian. Brown is also ineligible for consideration because Brown was not accused of misconduct. Rather, Brown identified personal weaknesses in a self-evaluation. Because self-evaluations are fundamentally different from allegations of misconduct, the Court will not consider Brown as a valid comparator.

Other proposed comparators must be dismissed because Cyprian has not provided sufficient factual information regarding the "quality and quantity" of their misconduct to create a factual issue regarding the alleged differential treatment.[12]   These would-be comparators are Crotz, Ward, Mitchell, Wallace, and Blake.   Cyprian describes their behavior as negative, not positive toward colleagues, overly and inappropriately expressive, sarcastic, unprofessional, disruptive, difficult to work with, lacking interpersonal communication skills, hostile, unable to meet deadlines, other misgivings, subject to complaints regarding communication skills, and demonstrating a complete disregard for others.  (Doc. #46 at 45-47).  While this misconduct sounds similar to some of the allegations of misconduct against Cyprian, "misconduct merely 'similar' to the misconduct of the disciplined plaintiff is insufficient" to establish a claim of discrimination.  *See Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir. 2008).  Rather, the conduct must be nearly identical.  *Id.*  Cyprian's short and generic descriptions of the comparators' misconduct falls short of demonstrating that the comparators were engaged in misconduct that was of the same quality and quantity as Cyprian's.  Moreover, Cyprian has not provided evidence regarding the ranks and responsibilities of these would-be comparators.[13]   Material

---

[12]  *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by citing to particular parts of the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . .").

[13]  In her deposition, Cyprian stated that she and Crotz, AUM's athletic director, were "on the same echelon as far as leadership is concerned."  (Doc. #41-1 at 52).  However, a review of the organizational chart provided by AUM indicates that the athletic director is at the same level

differences in ranks and responsibilities are relevant for considering whether an employee is a proper comparator.  *Id.*  Consequently, Cyprian has not demonstrated that she is similar to these employees in all relevant respects and none of them is a valid comparator.

With respect to the remaining comparators – Jackson, Veres, Salter, and Warren – Cyprian provides examples of their alleged misconduct that are relatively more specific.  She alleges that Jackson altered Cyprian's 2008 performance review, but was not investigated or disciplined like Cyprian was for altering the evaluations of the campus police officers.  (Doc. #46 at 36-37).  While Jackson's conduct may be similar in quality to Cyprian's conduct, it is not similar in quantity.  Jackson altered one evaluation – Cyprian's.  Cyprian altered multiple evaluations.  Cyprian has not established that AUM failed to investigate or discipline another dean who was suspected of altering multiple performance evaluations.

Cyprian alleges that Veres was not dismissed for failing to follow Part IV, B of the AUM Faculty Handbook relating to a faculty appointment to a department.  (Doc. #46 at 45).  The Faculty Handbook that Veres is supposed to have violated is apparently a different document altogether than the AUM Personnel Policies and Procedures Manual that Cyprian was alleged to have violated.[14]  In addition, Cyprian has not established that Veres's violation of a written policy was of the same type or degree as hers.  The record demonstrates that

_____

as AUM's vice chancellors.  (Doc. #42 at 27).  This is a different level than Cyprian's position as Dean of Student Affairs.

[14]  Cyprian's brief refers the Court to the "AUM Policy & Procedure Manual."  (Doc. #46, 45).  The Court reviewed the AUM Personnel Policies and Procedures Manual, (Doc. #47-47), but did not find Part IV, B nor did it find anything that related to faculty appointment to a department.

AUM classifies some violations as more severe than others and maintains "progressive disciplinary procedures" to deal with violations of differing severity. (Doc. #47-47 at 37-44). For purposes of identifying a suitable comparator, this Court cannot equate every violation of a written policy. *See Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1325 (11th Cir. 2006) ("Different types and degrees of misconduct may warrant different types and degrees of discipline . . . ."). Without more information regarding Veres's violation of AUM policy, Cyprian has failed to establish that Veres is a valid comparator.

Cyprian alleges that Warren was not investigated or reprimanded for failure to follow the Faculty Handbook in 2008. But as the Court has already pointed out, AUM classifies some violations as more severe than others and makes disciplinary decisions accordingly. Cyprian has failed to demonstrate that Warren's violation was sufficiently similar in quality and quantity to Cyprian's violation that they should have received equal discipline but did not. Consequently, Warren is not a valid comparator.

Finally, Cyprian alleges that Salter, the Director of University Relations who also reported to Jackson, was not reprimanded for failure to complete tasks by the appointed deadline. (Doc. #46 at 47). The Court observes that Cyprian did not receive any formal discipline for failure to meet deadlines and that Cyprian's failure to meet a deadline did not appear in the final version of her 2009 "below expectations" performance evaluation. (Doc. #42 at 34). In addition, Cyprian admitted that she did not know what was contained in Salter's performance evaluation and that she was speculating when she claimed that Salter had been evaluated differently. (Doc. #42 at 35). Consequently, Cyprian has not established

that Salter is a valid comparator with respect to discipline for missed deadlines.  Cyprian also alleges that she was reprimanded for Salter's failure to notify the deans regarding a recruitment reception and that this demonstrates discriminatory application of disciplinary policies.  (Doc. #46 at 47).  But Cyprian has not demonstrated that Salter was not herself reprimanded or otherwise penalized for failing to notify the deans.  And, as already pointed out, Cyprian was speculating when she claimed that AUM evaluated Salter differently.  (Doc. #42 at 35).  For these reasons, Cyprian has not established that Salter is a valid comparator.

Because Cyprian has failed to put forth a valid comparator she cannot establish her race discrimination claim based on the allegations of discriminatory application of the disciplinary policies at AUM.  Nevertheless, because the fourth prong of the prima facie case is disjunctive, and because Cyprian has established that she was replaced, at least in part, by someone from outside of her protected class, Cyprian has satisfied the fourth prong and has made out a prima facie case of employment discrimination on the basis of her dismissal from AUM.

### b.    Legitimate, nondiscriminatory reasons

After establishing a prima facie case of discrimination, the burden shifts to AUM to articulate a legitimate, nondiscriminatory reason for its actions.  *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010).  Because Cyprian has established a prima facie case of discrimination based only on her dismissal from AUM, the Court need only look to see whether AUM has offered legitimate, nondiscriminatory reasons for dismissing Cyprian.

29

The record shows that on June 3, 2009, Veres dismissed Cyprian based upon his consideration of the oral report he received from Dr. Sims, Dr. Deravi's consistent recommendation and report, Cyprian's poor performance, the lack of progress in Cyprian's division, and "months and months of issues arising in Student Affairs." (Doc. #42 at 39). The Court finds that AUM has sufficiently proffered legitimate and nondiscriminatory reasons for terminating Cyprian's employment and has therefore sufficiently met its burden of rebutting the prima facie case of unlawful retaliation. *See Brown*, 597 F.3d at 1174 (stating that "the employer need not persuade the court that it was actually motivated by the proffered reasons.") (internal quotations and citation omitted). As a result, the presumption of discrimination established through the prima facie case disappears and the burden shifts back to Cyprian to show that AUM's proffered reasons for dismissing Cyprian were actually a pretext for prohibited discriminatory conduct. *Johnson v. Booker T. Washington Broadcasting Svc., Inc.*, 234 F.3d 501, 507 n.6 (11th Cir. 2000).

### c.      Pretext

To show pretext, Cyprian must demonstrate that AUM's proffered reasons were not the true reasons for her dismissal. *See Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*  Thus, a plaintiff can demonstrate pretext by pointing to "weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions" in the proffered explanation.  *See Jackson*, 405 F.3d at

1289.  A plaintiff does not establish pretext "unless it is shown *both* that the reason was false,

*and* that discrimination was the real reason."  *St. Mary's Honor Center v. Hicks*, 509 U.S.

502, 515 (1993) (emphasis in original). A plaintiff must rebut each of the defendant's

proffered reasons.  *See Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) ("If

the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact

regarding whether each of the defendant's articulated reasons is pretextual, the defendant is

entitled to summary judgment.").

When AUM dismissed Cyprian it told the media, AUM staff, and the student body

that she was dismissed because a change in leadership was needed.  (Doc. #46 at 50).

Cyprian attempts to discredit AUM by asserting that the reasons now proffered for her

dismissal – the recommendations of Dr. Sims and Dr. Deravi, Cyprian's disciplinary record,

and other problems in the Division of Student Affairs – are pretextual because they do not

match the reason initially given for her dismissal.  This argument lacks merit.  The reason

that AUM provided – that a change in leadership was needed – is completely consistent with

the reasons that AUM is now providing.  Had the statements been inconsistent with each

other the Court may have entertained Cyprian's argument further. *Cf. Tidwell v. Carter

Prod.*, 135 F.3d 1422, 1428 (11th Cir. 1992) (stating that articulated reasons that differ are

only evidence of pretext if they are inconsistent).  As it stands, this argument fails to establish

pretext.

Cyprian next argues that Dr. Sims's recommendation that Cyprian be dismissed is

pretextual because Dr. Sims did not put his recommendation in writing until after Cyprian was dismissed.  Cyprian argues that Dr. Sims's written recommendation is an improper after-the-fact justification for her dismissal.  *See Campbell v. Civil Air Patrol*, 138 F. App'x 201, 203 (11th Cir. 2005) (an employer's after-the-fact, legitimate reason for taking an adverse employment action cannot be considered if that reason did not actually motivate the employer at the time it made the decision).  Additionally, Cyprian argues that only after Cyprian began legal action did Veres indicate that he had relied on Dr. Sims's recommendation when deciding to dismiss Cyprian.

To support this argument, Cyprian states that there is a dispute regarding the timing of Dr. Sims's recommendation.  (Doc. #46 at 52).  But the arguments in the briefs do not indicate that there is an actual dispute.  AUM states that Dr. Sims provided an oral recommendation before Cyprian was dismissed.  (Doc. #42 at 40).  Cyprian states that Dr. Sims provided a written recommendation of termination three days after Cyprian was dismissed.  (Doc. #46 at 51).  This sequence of events is undisputed and is not in conflict. The Court has not found any place in the record where Cyprian argues that Dr. Sims did not make an oral recommendation to Veres on June 3rd.[15]  "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56©, the court may . . . consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P 56(e)(2).  Therefore, this argument

---

[15]  In fact, in her claim for unlawful retaliation, Cyprian argues that there is a causal connection between her conversation with Dr. Sims and Chancellor Veres's decision to dismiss her.  (Doc. #46, 67).  If this does not firmly establish that Dr. Sims recommended Cyprian's dismissal on June 3rd, it does lend credibility to AUM's statement that it dismissed Cyprian based on Dr. Sims's recommendation.

fails to show pretext.

Cyprian argues that the "criteria for terminating Dr. Cyprian was purely subjective placing the unfettered discretion in the hands of Drs. Veres and Jackson." (Doc. #46 at 52). According to Cyprian, the "use of subjective criteria by white supervisors in making employment decisions effecting [sic] black people has been uniformly condemned in this circuit." (*Id.*).[16] But assuming, as Cyprian does in her brief, that Dr. Sims communicated his recommendation to Veres before Cyprian was dismissed, the situation is quite different from a white supervisor using subjective criteria to dismiss an African-American employee. (Doc. #46 at 52). First, Dr. Sims is African American and was not Cyprian's supervisor. Dr. Sims's recommendation identified Cyprian as "the single largest disruptive factor on campus" and an impediment to AUM's efforts to improve services to students. (Doc. #42 at 23). Thus, the decision to dismiss Cyprian is not analogous to a white supervisor utilizing "high-level subjectivity" such as an employee's "drive", "adaptability", "demeanor and manner", or "social behavior" to evaluate an employee's performance. *See Robinson v. Union Carbide Corp.*, 538 F.2d 642, 666 (5th Cir. 1976). Second, AUM's decision to dismiss Cyprian was based on more than what Cyprian considers to be subjective criteria. Veres also referred to Cyprian's recent formal discipline and "months and months of issues arising in Student Affairs." (Doc. #42 at 39). Third, "a subjective reason can constitute a

---

[16] Although her brief does not provide a citation to authority, this quoted language appears to come from *Jackson v. Wakulla Springs & Lodge*, 1983 U.S. Dist. LEXIS 14694, 39-40 (N.D. Fla. Aug. 11, 1983) (stating "[t]he use of subjective criteria by white supervisors in making employment decisions effecting [sic] black people has been uniformly condemned in this circuit.").

legally sufficient, legitimate, nondiscriminatory reason under the *McDonnell Douglas/Burdine* analysis." *See Chapman*, 229 F.3d at 1033.

Cyprian suggests that Dr. Sims's personal relationships with Veres and Jackson made him biased against Cyprian. But the fact that these individuals have a prior relationship does little to suggest that AUM's proffered reasons for dismissing Cyprian are a pretext for race discrimination. The sparse facts of a prior relationship are too thin a reed on which to base an inference that the relationship between Veres, Sims, and Jackson inappropriately influenced the decision to dismiss Cyprian such that AUM's proffered legitimate reasons lack all credibility.

Cyprian claims that the AUM budget for 2010, which was drafted in May 2009, showed a vacancy in her position as Dean of Students. There is also an email dated June 3, 2009 from Sims to Veres suggesting that new university deans would be joining AUM in the near future. Based on this information, Cyprian argues that the decision to terminate her employment had been made before Dr. Sims made his recommendation to Veres, and thus reliance on Dr. Sims's recommendation as a basis for terminating Cyprian's employment is pretextual. Cyprian's argument is speculative. Without an adequate foundation for her claim there is no evidence here that would create a genuine issue of material fact as to AUM's proffered reasons for dismissing her.

Cyprian claims that she behaved appropriately at the AUM retreat and that Dr. Sims was a poor judge of her behavior because of his limited association with her. However, there are several statements in the record that Cyprian exhibited poor behavior at the retreat. In

his affidavit, Dr. Sims described her as vindictive, unable to accept constructive criticism, disruptive, antagonistic, and unreceptive. (Doc. #41-14 at 2). Deravi corroborated Dr. Sims's description. (Doc. #42 at 22-23). Veres overheard another AUM dean ask Cyprian if she was trying to get fired. (Doc. #42 at 22). Cyprian's self-serving assertion that her behavior at the retreat was appropriate has not established weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions as to AUM's proffered reasons for her dismissal. Moreover, Cyprian cannot establish pretext by quarreling with AUM's determination that her behavior was inappropriate and with AUM's decision to credit Dr. Sims's recommendation. *See Chapman*, 229 F.3d at 1030 ("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.").

Cyprian also claims that employees at the retreat were encouraged to speak freely without fear of repercussion for their comments. Cyprian claims that when she participated in the retreat she was subject to adverse employment action for her behavior while other white employees were not subject to discipline. But Cyprian does not describe her behavior or that of the other employees so that the Court may decide whether there in fact was discriminatory treatment. Cyprian simply asks that the Court take her word for it. This is insufficient. *See Raspanti v. Four Amigos Travel, Inc.*, 266 F. App'x. 820, 824 (11th Cir. 2008) ("Raspanti failed to establish that the reasons given by Four Amigos were pretextual because she did not present evidence that . . . the company treated her differently from

similarly situated employees.").

Cyprian cites to three affidavits to support her claim that similarly situated white employees committed the same conduct as Cyprian without discipline.  But none of the cited affidavits provides evidence that similarly situated white employees received more favorable treatment.[17]  (Doc. #46 at 57).  While the Court must accept a plaintiff's evidence at the summary judgment stage, it is not required to take a plaintiff's unsubstantiated word regarding the defendant's alleged unlawful behavior.  *See Celotex Corp.*, 477 U.S. at 324 ("[Rule 56] therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial.'").

Cyprian argues that she did not deserve a "below expectations" rating and that she did not commit the conduct for which she received a reprimand.  This is not a head-on rebuttal of AUM's reason for dismissing her.  A head-on rebuttal requires Cyprian to state that AUM did not in fact rely on her performance rating and reprimand.  Cyprian's contention is therefore insufficient quarreling.  *Chapman*, 229 F.3d at 1030 (the plaintiff may not simply quarrel with the wisdom of the reason proffered "but must meet it head on and rebut it.").  The Court will not now "sit as a super-personnel department that reexamines an entity's business decisions."  *See Id.* at 1030.

---

[17]  The only cited evidence that provides a modicum of support for this claim is the allegation that Jackson also altered university records but was not disciplined or dismissed by AUM.  On this point, there is insufficient evidence to show that Jackson and Cyprian were similarly situated employees who engaged in similar behavior but were subject to divergent disciplinary action.  Thus, there is not a genuine issue of material fact on this issue.

Cyprian also argues that the reasons for her dismissal are pretextual because there is "an enormity of evidence" that demonstrates the racial animus at AUM. (Doc. #46 at 57). Cyprian argues that evidence of an employer's general atmosphere of discrimination along with any other evidence bearing on motive should be considered when determining whether a plaintiff has demonstrated pretext. (Doc. #46, 58); *see Sweeney v. Bd. of Trs. of Keene State College*, 604 F.2d 106, 113 (1st Cir. 1979) ("Proof of a general atmosphere of discrimination is not the equivalent of proof of discrimination against an individual, but evidence of such an atmosphere may be considered along with any other evidence bearing on motive in deciding whether a Title VII plaintiff has met her burden of showing that the defendants' reasons are pretexts."). Cyprian has not provided any binding authority to support this argument. But even if she had, this Court would find that there is insufficient evidence of a discriminatory atmosphere to demonstrate pretext.

Cyprian's evidence of a general atmosphere of discrimination consists of Wanda Blake's comment that no African American should earn $95,000; a student complaint about racism that went unanswered; an anonymous note to Adrienne Giles – an AUM employee – stating that "blacks should not be in her job"; the affidavits of three individuals; and the EEOC charges of four individuals. (Doc. #46 at 57-58).

The Court has studied this evidence and determines that it does not support a reasonable inference that AUM was motivated by racial animus when it dismissed Cyprian. Assuming these statements and affidavits constitute admissible evidence, they do not create a genuine issue of material fact that AUM fired Cyprian because of her race. The comment

about how much African-American employees should earn, the anonymous note Giles received, and AUM's alleged failure to respond to a student complaint appear to be isolated events and are insufficient to establish a general environment of discrimination leading to Cyprian's dismissal.  Of the four EEOC charges cited to support Cyprian's claim of racial animus at AUM, only two of them allege race discrimination.  (*Compare* Doc. #47-43 [Bhuiyan EEOC charge alleges, among other things, race discrimination] *and* Doc. #47-44 [McCray EEOC charge alleges, among other things, race discrimination] *with* Doc. #47-42 [Crabtree EEOC charge alleges sex, age, and disability discrimination as well as retaliation] *and* Doc. #47-53 [Gribben EEOC charge alleges age discrimination and retaliation]). Moreover, not one of the EEOC charges alleges racially discriminatory conduct that occurred while Cyprian was employed at AUM.  Taken together, the EEOC charges are insufficient to support Cyprian's argument that an environment of racial discrimination at AUM was the real reason that she was dismissed.

The three affidavits that Cyprian cites retread ground that this Court covered when it determined that there was not sufficient evidence to establish racial harassment that was severe or pervasive.  All of the evidence of discrimination in these three affidavits is circumstantial.  *Cf. Damon*, 196 F.3d at 1359 ( "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race] will constitute direct evidence of discrimination." ) (internal quotation and citation omitted).  Foster's affidavit states that she and Cyprian were required to meet more frequently with Jackson than other white employees; that Jackson falsely accused her of unprofessional behavior; that Jackson

38

would listen to white employees but not African-American employees; that AUM did not investigate charges of racism in a timely manner; and that AUM disciplinary policies were applied differently to white employees than to African-American employees. (Doc. #47-14). Beasley Singleton's affidavit states that he was often referred to as "Do boy", but he does not indicate who referred to him by that name. (Doc. #47-33). Giles's affidavit states that she is the only African-American secretary who is required to use a time clock and that she received an anonymous note saying "we do not like blacks here". (Doc. #47-34). Giles does not explain why her required use of a time clock is discriminatory nor does she indicate if there are other African-American secretaries at AUM and why they are not required to use time clocks.

Considering this evidence of a general atmosphere of discrimination along with the other evidence of AUM's reasons for dismissing Cyprian, Cyprian has failed to show that it is more likely that AUM dismissed Cyprian for racially discriminatory reasons than for the reasons that AUM proffered.

Although Cyprian successfully established a prima facie case of employment discrimination based on her dismissal from AUM, she failed to adequately rebut each of AUM's proffered legitimate business reasons for her dismissal. As a result, AUM's motion for summary judgment on Cyprian's claim for unlawful discrimination is due to be granted.

### 3. Count III - Unlawful retaliation

Count III of Cyprian's complaint alleges that AUM violated Title VII of the Civil Rights Act and 42 U.S.C. § 1981 by unlawfully retaliating against her. (Doc. #38 at 22). In

the employment context, the same substantive analysis applies to both § 1981 and Title VII

claims of retaliation.  *See Tucker v. Talladega City Sch.*, 171 F. App'x 289, 296 (11th Cir.

2006).  Claims for unlawful race-based retaliation are analyzed under the *McDonnell-

Douglas* burden-shifting framework applied previously to Cyprian's discrimination claim.

*Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009).

      **a.**      **The prima facie case**

To establish a prima facie case of unlawful retaliation, the plaintiff must demonstrate

(1) that she engaged in statutorily protected activity; (2) that she suffered a materially adverse

employment action; and (3) that there was a causal connection between the protected activity

and the adverse employment action.  *See Howard v. Walgreen Co.*, 605 F.3d 1239, 1244

(11th Cir. 2010).

For purposes of summary judgment, AUM concedes that Cyprian engaged in

protected activity when she submitted her March 5, 2009 complaint letter.  (Doc. #42 at 50).

However, because the causation prong of the prima facie analysis is time-sensitive, it is

necessary to consider Cyprian's other alleged occurrences of protected activity.

"Statutorily protected expression includes complaining to superiors about harassment

in the work place, lodging complaints with the EEOC and participating in

discrimination-based lawsuits." *Laosebikan v. Coca-Cola Co.*, 167 F. App'x 758, 764 (11th

Cir. 2006) (citing *Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir.

2001)); *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010)

(deeming plaintiff's letter to company official complaining of discrimination based on Cuban

origin to be statutorily protected activity).

Cyprian claims that she engaged in protected activity when she complained about a hostile work environment in September 2008.  There is some dispute between the parties about whether this complaint involved claims of a work environment that was merely hostile or a work environment that was racially hostile.  The distinction is important because  Title VII "does not prohibit harassment alone, however severe and pervasive.  Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category" such as race.  *Baldwin*, 480 F.3d at 1301-02.  Resolving this dispute in Cyprian's favor, the Court finds that Cyprian engaged in protected activity when she complained about a hostile work environment in September 2008.  *See Moorman v. UnumProvident Corp.* 464 F.3d 1260, 1264 (11th Cir. 2006).

Finally, Cyprian claims that she engaged in protected activity when she complained to Dr. Sims about racial discrimination on June 3, 2009.  (Doc. #46 at 66).  AUM points out that this claim of protected activity appears for the first time in Cyprian's brief opposing summary judgment.  (Doc. #54 at 20).   A review of Cyprian's second amended complaint and her brief opposing summary judgment reveals that AUM is correct.   Nowhere in the complaint does Cyprian allege that her dismissal was in retaliation for a complaint she made on June 3, 2009.  In fact, Cyprian's complaint does not even allege that she complained about racial hostilities in June 2009.  (Doc. #38 at 19).  A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.  *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).  Because Cyprian never amended her

complaint to include a claim of retaliation based on her June 3, 2009 conversation with Dr. Sims, that claim is not properly pled and the Court will not consider it.  *See Thampi v. Manatee Cnty. Bd. of Comm'rs*, 384 F. App'x 983, 988 (11th Cir. 2010) ("[B]ecause Thampi never amended his complaint to include a claim of retaliation based on the filing of his lawsuit, such a claim was not properly pled, and the magistrate did not err in granting summary judgment in favor of Manatee on this claim.").  Therefore, the only instances of protected activity properly before the Court are Cyprian's September 2008 complaint and her March 5, 2009 complaint.

It is undisputed that AUM took adverse employment action against Cyprian when it terminated her employment on June 3, 2009.  (Doc. #42 at 50; Doc. #46 at 59).  Thus, the second element is satisfied and the Court moves on to the causal link.

"The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (quotations omitted). "A plaintiff satisfies this element if [s]he provides sufficient evidence" of knowledge of the protected expression and "that there was a close temporal proximity between this awareness and the adverse . . . action." *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n.3 (11th Cir. 2003) (quoting *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999)). Cyprian was dismissed from AUM on June 3, 2009 – approximately nine months after her September 2008 complaint and approximately three months after her March 5, 2009 complaint. Cyprian states that Veres was aware of Cyprian's complaints regarding her work

environment, but she does not present any other evidence that the September 2008 or March 5, 2009 complaints were causally connected to her June 2009 dismissal from AUM. (Doc. #46 at 67). The Court is not persuaded that a period of nearly three months – much less a period of nine months – is sufficiently proximate to show causation in this case. *Higdon*, 393 F.3d at 1220-21 (holding that, by itself, three months was insufficient to prove causation); *see also Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (In a Family and Medical Leave Act discrimination case the court stated, "We are not persuaded that three months . . . is sufficiently proximate to show causation.").

Because Cyprian has failed to establish a causal link, she cannot establish a prima facie case of unlawful retaliation and AUM's motion for summary judgment as to this claim is due to be granted.

## V. Conclusion

For the foregoing reasons, the Defendants' motion for summary judgment, (Doc. #40), is GRANTED. The Defendants' motion to strike is DENIED as moot. The pretrial conference and trial that were previously continued generally are now CANCELLED.

Done this the 1st day of July, 2011.


　　　　　　　　　　　　/s/ Mark E. Fuller
　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE